UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - X

05 Civ. 0168 (WCC)

DENNIS ROLON,                          :

                        Plaintiff,     :       **ECF CASE**

          - against -                  :       **OPINION**
                                               **AND ORDER**
JOHN WARD, Supervisor, Town of Wallkill,:
sued in his official and individual
capacities, ROBERT HERTMAN, Chief of   :
Police, sued in his official and
individual capacities, and TOWN OF     :
WALLKILL,
                                       :
                        Defendants.
                                       :
- - - - - - - - - - - - - - - - - - - X


**A P P E A R A N C E S :**

                              SUSSMAN & WATKINS
                              **Attorneys for Plaintiff**
                              P.O. Box 1005
                              Goshen, New York  10924

MICHAEL H. SUSSMAN, ESQ.

          Of Counsel


                              GELARDI & RANDAZZO LLP
                              **Attorneys for Defendants**
                              151 Broadway
                              Hawthorne, New York 10532

JAMES A. RANDAZZO, ESQ.

          Of Counsel

**Copies E-Mailed to Counsel of Record**

**CONNER, Senior D.J.:**

Plaintiff Dennis Rolon brings this action against defendants John Ward ("Ward"), Robert Hertman ("Hertman") and the Town of Wallkill (the "Town") (collectively, "defendants") pursuant to 42 U.S.C. § 1983. He alleges that defendants violated his First Amendment rights by retaliating against him for engaging in protected activities, including prior use of the federal courts and an arbitral forum.[1] Defendants move for summary judgment pursuant to FED. R. CIV. P. 56. For the reasons stated below, defendants' motion is denied in its entirety.

**BACKGROUND**

## I.     The Parties

Unless otherwise indicated, the following facts are undisputed. Plaintiff has been employed as a police officer by the Town since October 1997. (Defs. R. 56.1 Stmt. ¶ 1.) Defendant Ward was elected to the position of Supervisor of the Town in November 2001 and took office in January 2002. (*Id*. ¶ 2.) Defendant Hertman was appointed Chief of Police of the Town, effective February 2002. (*Id*. ¶ 3.) As the Police Chief, Hertman had authority to issue disciplinary charges against police officers in the Wallkill Police Department (the "Department"). (Sussman Aff'm, Ex.15 at 61-62.) In addition, although he was not authorized to terminate a police officer's employment, he did have authority to request, without Town Board approval, that an arbitrator order an officer's termination. (*Id*.) John Quinn, who is not a party to this action, served as Deputy Police Chief of the Town from December 2004 to July 2006. (Pl. R. 56.1 Reply, Counterstmt. ¶ 10.)

---

[1] Plaintiff initially alleged a violation of his right to due process of law as guaranteed by the Fourteenth Amendment of the United States Constitution, but subsequently agreed to voluntarily dismiss this claim. (Complt. ¶ 34; Pl. Mem. Opp. Summ. J. at 22.)

Pursuant to a collective bargaining agreement between the Town and the Police Benevolence Association ("PBA") (the "collective bargaining agreement"), the disciplinary procedures in the Department are as follows. "If the Chief [of Police] determines that an employee should be disciplined for incompetence or misconduct, the employee shall be served with a Notice of Discipline which shall set forth the charge of incompetence or misconduct as well as the proposed penalty." (Randazzo Decl., Ex. BB at 23.) The Notice of Discipline must be served on the employee within 180 days of the alleged incompetency or misconduct, after which a "disciplinary interview" is held, involving "a meeting between the employee . . . and the Chief . . . held for the purpose of discussing a matter which may lead to the imposition of discipline." (*Id*. at 23-24.) The employee is entitled to union representation at this interview. (*Id*. at 24.) The chief then makes a finding as to the employee's guilt with regard to the charges and may impose a disciplinary penalty. (*Id*.) The employee may appeal the decision to the Town Supervisor, who then holds an informal meeting on the charges and penalty. (*Id*.) Once the Supervisor makes his decision, the union may "grieve" it to arbitration. (*Id*. at 25.)

## II.    Plaintiff's 2000 Lawsuit, 2000 Suspension and 2001-02 Arbitration Proceeding

In the spring of 2000, plaintiff filed a lawsuit in federal court alleging that, acting through its police department and acting Police Chief, the Town of Wallkill, its Police Commission, and various individual members of the Police Commission had violated his due process rights by illegally suspending him in contravention of an extant collective bargaining agreement. (Defs. R. 56.1 Stmt. ¶ 4.) After extensive discovery, the case settled in 2001. (*Id*. ¶ 5.) Neither Ward nor Hertman were involved in the lawsuit, any of the underlying substantive allegations or the settlement. (*Id*. ¶ 6.)

Moreover, at the time during which the events that gave rise to the underlying lawsuit occurred, Ward had not yet been elected Town Supervisor and Hertman had not yet been elected Chief of Police. (*Id*. ¶¶ 6-7.)  Hertman testified that he was not aware of any lawsuits other than plaintiff's filed in federal court by an individual police officer against the Department during his tenure as Police Chief. (Pl. R. 56.1 Reply, Counterstmt. ¶ 43.)

Subsequent to the initiation of his lawsuit, plaintiff was suspended without pay from August 2000 to February 2002 after then-acting chief of the Department, Robert Henneman ("Henneman"), served him with a Notice of Discipline containing various charges of misconduct.  (Sussman Aff'm, Ex. 16 at 7; Defs. R. 56.1 Stmt. ¶ 8.)   The Town Board approved plaintiff's suspension, which continued during the administration of Ward and through the administrations of the Police Chiefs succeeding Henneman, including John Bearisto and Hertman. (Pl. R. 56.1 Reply ¶ 8.)

Between January 24, 2001, and August 31, 2001, an arbitrator held hearings regarding the disciplinary charges underlying plaintiff's suspension and, in February 2002, issued an opinion finding plaintiff guilty of three "specifications" and not guilty of 12 "specifications" with which he was charged. (Defs. R. 56.1 Stmt. ¶ 9; Sussman Aff'm, Ex. 16 at 58.)   The arbitrator also held that the Town violated the collective bargaining agreement when it suspended plaintiff without pay in August 2000.  (Pl. R. 56.1 Reply, Counterstmt. ¶¶ 23-24.)  The arbitrator imposed oral counseling and a two-day suspension without pay and ordered that plaintiff be reinstated with back pay less the two days pay reflecting the disciplinary suspension, with full seniority and all fringe benefits for the entire period of his unlawful suspension.  (Sussman Aff'm, Ex. 16 at 58.)  The arbitrator's opinion noted that, during the course of the arbitration proceedings, Sergeant Ari Moskowitz ("Moskowitz"), a member of the Department and a witness at the proceedings, had refused to produce evidence that

the arbitrator believed to be material and necessary to plaintiff's defense.[2] (*Id*. at 17-18.) The arbitrator also found that Henneman's testimony during the proceeding was not credible, evasive, and indicative of an "evident hostility to Rolon." (Pl. R. 56.1 Reply, Counterstmt. ¶ 22; Sussman Aff'm, Ex. 16 at 25-27, 46, 48, 53.)

By February 2003, the Town had repaid plaintiff his base salary pursuant to the arbitrator's award, but not the required benefits. (Rolon Aff. ¶ 17; Pl. R. 56.1 Reply, Counterstmt. ¶¶ 17, 27; Sussman Aff'm, Exs. 31, 32.) Ward met with plaintiff on more than one occasion to discuss plaintiff's claim for backpay and benefits. (Pl. R. 56.1 Reply, Counterstmt. ¶ 36.) Plaintiff presented Ward with documentation to support his claims for the amount owed him and Ward asked his secretary to verify whether the documentation was confirmed by court records and other documentation. (*Id*. ¶ 37.) According to Ward, the issue of the sum due to plaintiff was discussed several times at the Town Board level. (Sussman Aff'm, Ex. 28 at 68-69.) According to plaintiff, as of September 8, 2008, the Town had continued to "refuse[] to comply" with the arbitrator's award. (Rolon Aff. ¶ 22.) Defendants add that the Town's attorneys were handling the issue of plaintiff's claim to backpay and Hertman was involved only to the extent that he provided information regarding the matter to the Town's attorneys. (Defs. Reply Mem. Supp. Summ. J. at 2.)

Neither Ward nor Hertman was involved in the arbitration, any of the underlying substantive allegations or the final decision. (Defs. R. 56.1 Stmt. ¶ 11.) According to plaintiff, Ward never read the arbitrator's decision and never spoke with Hertman about taking action against Moskowitz "for his contempt of the arbitral process," even though Ward was aware of Moskowitz's refusal to turn

---

[2] As a result, Moskowitz's testimony was struck. (Sussman Aff'm, Ex. 16 at 17-18.)

over requested evidence to the arbitrator.[3] (Pl. R. 56.1 Reply, Counterstmt. ¶¶ 29, 30.) Nor did Ward discuss the issue with the Town counsel. (*Id*. ¶ 31.) When Ward was asked by plaintiff's counsel whether he had read the part of the arbitrator's decision which plaintiff's counsel described as concluding "that Mr. Henneman gave misleading or false testimony, and at one point, at least, concludes that he did that for personal gain because he felt it would advance himself within the police department," Ward replied "No." (Pl. R. 56.1 Reply, Counterstmt. ¶ 32; Sussman Aff'm, Ex. 28 at 16.)

Hertman, who was serving as Police Chief when the arbitrator's decision was released, received a copy, but contends that he did not read the entire opinion and does not recall which parts he read. (Pl. R. 56.1 Reply, Counterstmt. ¶ 33; Sussman Aff'm, Ex. 15 at 24. ) He could not recall specifically the parts of the decision concerning the conduct of Moskowitz and Henneman, and did not remember whether he spoke with either of them about the decision. (Pl. R. 56.1 Reply, Counterstmt. ¶¶ 34-35.) He did not initiate any disciplinary action against either of them. (*Id*. ¶ 35.)

In February 2002, after the arbitrator's opinion was issued, plaintiff returned to work. (Complt. ¶ 20.) Plaintiff alleges that "[d]espite the arbitration decision which made clear that Henneman had falsified charges against [him] and acted out of personal animosity toward him, upon [his] return to duty, Hertman assigned [him] to a squad led by Robert Henneman," but that "after union intervention, Hertman altered this assignment." (*Id*. ¶¶ 20-21.)[4] However Hertman testified

---

[3] Ward's deposition indicates that Ward is "not sure" if he received a copy of the arbitrator's decision and does not "remember" reading the decision, and that he is "not sure" whether he ever talked with anyone about whether Moskowitz should be disciplined for refusing to participate in the arbitration. (Sussman Aff'm, Ex. 28 at 14-15.)

[4] Plaintiff notes that at the time of his assignment, there were two other sergeants working for the Department. (Pl. R. 56.1 Reply, Counterstmt. at 13 n.3.)

that he was not involved in the assignment and that plaintiff was not assigned to Henneman's squad. (Randazzo Decl., Ex. D at 31-32.) Defendants note that plaintiff admitted that he never complained to the chief, could not recall whether the assignment lasted more than one week and admitted that his assignment to the squad was "quickly changed." (Defs. Mem. Supp. Summ. J. at 4.)

Plaintiff received a performance evaluation in 2002, covering the period from April 1, 2002 to September 30, 2002. (Sussman Aff'm, Ex. 34.)[5] The evaluation notes many of plaintiff's positive qualities as a police officer, including, *inter alia*, that he is physically fit, has a good working knowledge of the traffic laws, that he is "usually calm, cool and collected," and "arrives safely and quickly to calls." (*Id*.) It also states "Professionalism - At times does well in this area. But, then sets himself back with personal complaints. Would recommend that Dennis not take things personally." (*Id*.)

In January 2005, plaintiff filed this lawsuit against Ward, Hertman and the Town, alleging that a number of decisions concerning his employment in the roughly three years since his return to the Department in 2002 were made "in retaliation for [his] prior litigation against the Town of Wallkill" and his use of the arbitral forum. (Complt. ¶¶ 23-30.) The relevant allegations are as follows.

### III.    Disciplinary Charges Brought Against Plaintiff

Plaintiff alleges that after his return to the Department in 2002, defendants "brought [him] up selectively on disciplinary charges and sanctioned him." (*Id*. ¶ 23.) In chronological order, the

---

[5] Plaintiff states in his Rule 56.1 Counterstatement of Facts that the evaluation was provided by Hertman, but Hertman's name is not on the document. (Pl. R. 56.1 Reply, Counterstmt. ¶ 62; Sussman Aff'm, Ex. 34.)

charges follow.

**A.      Notice of Discipline Dated September 24, 2002**

This Notice of Discipline, signed by Hertman, charged plaintiff with mistakes in ten of his "Stop Reports," reports submitted each time an officer conducts a stop of a vehicle, between March 28, 2002 and August 17, 2002.  (Sussman Aff'm, Ex. 18.)   After a disciplinary interview held on September 27, 2002, Hertman issued a decision on October 10, 2002, finding plaintiff guilty of the charges and imposing a penalty of the loss of leave entitlements of five accrued vacation days.  (*Id.*, Ex. 21A.)  In a hearing before Ward regarding these charges, plaintiff argued that he had been singled out for unfair treatment and that the mistakes he was charged with were the result of inconsistent instruction as to proper procedures for Stop Reports.  (*Id.*, Ex. 43.)  In a decision dated March 6, 2003 Ward affirmed Hertman's findings of guilt and imposed a penalty of written reprimands and loss of three accrued vacation days.  (*Id.*)

Plaintiff directs the Court to reports issued pursuant to a consent decree entered in 2001 between the Town and the New York State Attorney General's office concerning the functioning of the Department (the "Consent Decree"), which indicates that, in 2002 numerous police officers and sergeants failed to prepare proper Stop Reports. (Pl. R. 56.1 Reply, Counterstmt. ¶ 45.)[6]  In addition, plaintiff asserts that defendants, despite requests, have provided no evidence that disciplinary charges were similarly brought against other police officers and sergeants for alleged deficiencies in their

---

[6] Pursuant to the 2001 Consent Decree, Hertman was required to provide quarterly reports to the Town Board, including, *inter alia*, complaints received against police officers and departmental action on any such complaints, including discipline. (Sussman Aff'm, Ex. 86 at 1; Pl. R. 56.1 Reply, Counterstmt. ¶ 9.)

Stop Reports. (*Id*. ¶¶ 49-50.)

This Notice of Discipline was resolved by a Stipulation of Settlement signed March 31, 2004, in which plaintiff admitted to the charges and waived "any rights he may have pursuant to the collective bargaining agreement to dispute [them]." (Randazzo Decl., Ex. G. at 2.)

### B.    Letter of Instruction Dated September 30, 2002

This Letter of Instruction, signed by Hertman, again charged that between March 8, 2002 and August 3, 2002, plaintiff failed to provide required information on a number of Stop Reports. (Defs. R. 56.1 Stmt. ¶ 50; Sussman Aff'm, Ex. 19.)[7] Plaintiff could not recall whether he had provided any of the specific referenced information on the Stop Reports that he submitted, but contends that "[d]uring this time period, Hertman failed to discuss any of these issues with [him]," and that the reason he made errors on his reports was that the Department changed the way in which the Stop Reports were to be prepared while plaintiff was on suspension and neglected to train him in the new method upon his return to work. (Defs. R. 56.1 Stmt. ¶ 51; Rolon Aff. ¶¶ 24-25.) Plaintiff states that he was aware that many other officers routinely prepared the Stop Reports as he did, and has provided evidence of seven instances in which other members of the Department made mistakes in their Stop Reports similar to the mistakes with which plaintiff was charged. (Rolon Aff. ¶ 25.)

### C.    Letter of Instruction Dated November 18, 2002

This Letter of Instruction, signed by Hertman, charged that plaintiff reported late for duty on

---

[7] Although the dates cited in this Letter of Instruction overlap with the dates cited in the Notice of Discipline dated September 24, 2002, the two disciplinary charges refer to different Stop Reports.

October 25, 2002.  (Defs. R. 56.1 Stmt. ¶ 52.)  Plaintiff admitted to this allegation. (*Id*. ¶ 53.)

Plaintiff contends that Hertman never discussed the matter with him before issuing the charge against

him.  (Rolon Aff. ¶ 26.)

### D.     Letter of Instruction Dated February 18, 2003

This Letter of Instruction, signed by Hertman, charged plaintiff with violating the

Department's Rules and Regulations while conducting an arrest on May 21, 2002.  (Sussman Aff'm,

Ex. 21.)  Specifically, it alleges that in response to the arrestee's request to speak to an attorney while

being transported to the Department, plaintiff replied "you are not going to get a phone call, its [sic]

cut and dry [sic]." (Randazzo Decl., Ex. R.)  Plaintiff recalled the arrest, but did not recall whether

he made that statement. (*Id*., Ex. C at 50-51.)  Plaintiff states that Hertman did not discuss the

underlying matter with him before issuing the Letter of Instruction.  (Rolon Aff. ¶ 29.)

### E.     Notice of Discipline Dated May 16, 2003

This Notice of Discipline, signed by Hertman, involved an incident on May 13, 2003, in

which plaintiff parked his vehicle in a parking space marked by a sign designating the space for

sergeants.  (Sussman Aff'm, Ex. 2.)  When plaintiff was directed to move his vehicle, he snapped

the sign from the space and threw it on the ground.  (*Id*.)  The Notice of Discipline called for a

suspension of ten days without pay and restitution.  (*Id*.)  It too was resolved by the March 31, 2004

Stipulation of Settlement.  (Randazzo Decl., Ex. G at 2.)

### F.     Letter of Instruction Dated January 2, 2004

This Letter of Instruction charged that plaintiff used inappropriate language when making an arrest on November 11, 2002.  (Defs. R. 56.1 Stmt. ¶ 54, quoting Randazzo Decl., Ex. S.) Plaintiff admitted making the statement. (*Id*. ¶ 55.)

### G.     Letter of Instruction Dated May 20, 2004

This Letter of Instruction concerned inaccuracies in plaintiff's Daily Activity and Patrol Logs compared to corresponding "blotter entries."  (Randazzo Decl., Ex. T.) Plaintiff could not recall whether the allegations of inaccuracies were true. (*Id*., Ex. C at 53.)

### H.     Notice of Discipline Dated November 29, 2004

This Notice of Discipline charged plaintiff with failing to obtain his supervisor's review of certain Stop Reports before submitting them to the dispatcher's bin, in violation of the Department's Rules and Regulations on five separate occasions in August 2004.  (Defs. R. 56.1 Stmt. ¶ 14; Randazzo Decl., Ex. J.)  The Notice of Discipline proposed a penalty of termination.  (Sussman Aff'm, Ex. 4.)  Plaintiff admits that he submitted each of the referenced Stop Reports to the dispatcher's bin prior to the supervisor's review, but asserts that "[a]t that time, this reflected departmental practice and was common to [his] observation with no disciplinary consequences for others." (Defs. R. 56.1 Stmt. ¶ 15; Rolon Aff. ¶ 32.)  Deputy Chief Quinn testified that there was no system in place requiring supervisory sign-offs of police reports before he instituted one around March 2006, two years after the charges against plaintiff.  (Pl. R. 56.1 Reply, Counterstmt. ¶ 81.) On April 26, 2005, Ward issued a Supervisor's Decision affirming the Notice of Discipline's finding

of guilt and penalty of termination. (Sussman Aff'm, Ex. 79.) In November 2005, the Department provided plaintiff with a Letter of Instruction as a resolution to the charges. (Defs. R. 56.1 Stmt. ¶ 16; Randazzo Decl., Ex. D at 73.)

## I.  Notice of Discipline Dated December 3, 2004

This Notice of Discipline charged plaintiff with misconduct arising from an incident involving Eliseo Llanos, a parolee supervised by the New York State Division of Parole with whom plaintiff's wife, Sumpao Thorpe, has a child. (Defs. R. 56.1 Stmt. ¶¶ 17-19.) On June 12, 2004, while still under parole supervision, Llanos drove a car to a bar in Wallkill and went inside. (*Id.* ¶ 21.) The bar is located in Sector 3 of the Town, which is divided into sectors by the Department. (*Id.* ¶ 22.) At that time, plaintiff was on duty and assigned to Sector 1. (*Id.* ¶ 23.) According to plaintiff, he followed a speeder, who he later learned was Llanos, from Sector 1 to Sector 3 and then into the parking lot of the bar, which is located close to the border of Sector 1. (Pl. R. 56.1 Reply, Counterstmt. ¶¶ 87-88.) He then issued a parking summons to the vehicle for parking in a parking spot designated for handicapped people. (Defs. R. 56.1 Stmt. ¶ 23.) According to plaintiff, before ticketing the car, he did not know the owner of the vehicle had any relationship to Llanos, but when the plate came back to reflect ownership by Nicola Knowles, the mother of Llanos's girlfriend, he concluded that the driver had likely been Llanos, who he believed was violating his parole by being in a bar at night. (Pl. R. 56.1 Reply, Counterstmt. ¶ 90.) Plaintiff adds that he believed that being at a tavern at 2:40 a.m. violated standard conditions of parole. (Pl. R. 56.1 Reply ¶ 27.)

Plaintiff then entered the bar with another police officer, Officer Barnett, approached Llanos, and requested identification. (Defs. R. 56.1 Stmt. ¶ 24.) Llanos produced his driver's license and

Officer Barnett wrote down the identifying information and returned it to Llanos. (*Id*. ¶¶ 25-26.) Plaintiff questioned Llanos about his curfew and asked why he was there while on parole. (*Id*. ¶ 27.) Llanos replied it was "none of your business," and plaintiff responded "[w]ell, we'll find out on Monday." (*Id*. ¶¶ 28-29, quoting Randazzo Decl., Ex. H at 3.) Thereafter, plaintiff prepared a Stop Report listing Llanos as a "NYS Parolee" and "driver/owner" of the vehicle he ticketed at the bar. (*Id*.) The Department subsequently received an in-person report regarding the incident from a witness, evidently Llanos. (Sussman Aff'm, Ex. 15 at 41.)

Plaintiff later reported to James Lyons, a New York State Parole Officer who was supervising Llanos, that he had found Llanos at the bar that night. Lyons determined that Llanos's presence in the bar did not violate his parole because his conditions of release did not then impose a curfew or prohibit alcohol consumption or presence in a bar. (Defs. R. 56.1 Stmt. ¶¶ 32-33.)[8] Plaintiff called Lyons several additional times concerning Llanos. (*Id*. ¶ 34.)

On June 27, 2004, Llanos complained to the Department, alleging that, after a meeting with Thorpe, plaintiff's wife, the license plate on the car Llanos was driving had been removed. (*Id*. ¶ 35.)[9] Later that day, at 11:19 p.m., the New York State Police Information Network was accessed from the Town's police station dispatch terminal computer to identify the owner of the plate. (*Id*. ¶ 36.) Defendants contend that an investigation by Hertman eliminated all people in a position to conduct the search except plaintiff, but plaintiff denies this claim, asserting that Llanos's complaint

---

[8] Plaintiff notes that Lyons then changed the parole conditions to reflect the standard conditions, which included restricting a parolee's access to bars. (Pl. R. 56.1 Reply ¶ 33.)

[9] The December 3, 2004 Notice of Discipline states that Llanos reported that a photograph was taken of the license plate, not that plate had been removed. (Sussman Aff'm, Ex. 5.) However, the arbitrator's opinion, issued March 21, 2008, states that the plate was removed. (Randazzo Decl., Ex. H at 4.)

concerned a matter for which he was never charged and with which he was not involved. (*Id*. ¶ 38; Pl. R. 56.1 Reply ¶¶ 35, 38.) Plaintiff adds that Hertman had no evidence that plaintiff ran Llanos's license plate "other than Llanos'[s] suspicion that [plaintiff] might do so." (Pl. R. 56.1 Reply, Counterstmt. ¶ 110.)

In the Notice of Discipline, which proposed termination as a penalty, plaintiff was charged with eight specific charges, including, *inter alia*, leaving his assigned sector without authorization and using departmental equipment to run the license plate number in violation of the Department's Rules and Regulations. (Sussman Aff'm, Ex. 5.) Police officers are permitted to leave their sector for "police necessity." (Pl. R. 56.1 Reply, Counterstmt. ¶ 86.) According to Hertman, following a speeding motorist from one sector to another constitutes "police necessity." (*Id*. ¶ 89.) An investigation ordered by Hertman concluded that " [plaintiff] wasn't seeking the person who was violating parole; he was seeking the person because he had a personal relationship with him." (Sussman Aff'm, Ex. 15 at 43.) At the time of the incident, a petition had been filed by Thorpe in Family Court to require that Llanos's visits with their child be supervised. (Defs. R. 56.1 Stmt. ¶ 20.) Plaintiff claims he did not know of any pending Family Court matters between his wife and Llanos on the night of the incident. (Rolon Aff. ¶ 33.)

On December 14, 2004, Hertman suspended plaintiff without pay, invoking a section of the collective bargaining agreement that "there is probable cause to believe that the continued presence of the employee on the job represents a potential danger to persons, property or would severely interfere with operations." (Pl. R. 56.1 Reply, Counterstmt. ¶ 77.) Plaintiff adds that this "was unusual since the event which prompted these charges occurred in June 2004 nearly six months before I was suspended, belying any claim that the suspension met the standard set forth by the

collective bargaining agreement for an unpaid suspension." (Rolon Aff. ¶ 31.)

Quinn, who joined the Department six months after the June 2004 Llanos incident, claims to have been present for a departmental interview with Barnett and testified that this interview may have occurred as long as one year after the incident. (Pl. R. 56.1 Reply, Counterstmt. ¶ 94.) Quinn could not recall the substance of the interview with Barnett and did not prepare a report concerning it. (Sussman Aff'm, Ex. 29 at 45-46.) Plaintiff contends that Barnett was not sanctioned in any way for his role in the Llanos manner, however the record does not clearly reflect this. (Pl. R. 56.1 Reply, Counterstmt. ¶ 96.) Quinn does not recall having interviewed plaintiff about the incident. (Sussman Aff'm, Ex. 29 at 54-55.)

In a decision dated March 10, 2005, Hertman found plaintiff guilty of all charges concerning Llanos and imposed a penalty of termination. (Pl. R. 56.1 Reply, Counterstmt. ¶ 112.) The Notice of Discipline charges that plaintiff's actions "violated federal, state and local law," but plaintiff notes that at Hertman's deposition, when asked what local, state or federal law plaintiff violated, he could not give a specific answer. (*Id*. ¶ 111; Sussman Aff'm, Ex. 65 at 4, Ex. 15 at 56-57.) On April 26, 2005, Ward affirmed Hertman's finding and the sanction he imposed. (Pl. R. 56.1 Reply, Counterstmt. ¶ 113.) On March 21, 2008, an arbitrator concluded that plaintiff was guilty of five specifications of misconduct, and interposed, *inter alia*, a forty-five-day suspension without pay. (Defs. R. 56.1 Stmt. ¶¶ 17, 39.) According to Hertman, during his tenure as Police Chief, one other police officer was issued a Notice of Discipline for allegedly being out of a sector (Sussman Aff'm, Ex. 15 at 125-26.) He could not recall if any other officers were also issued such Notices of Discipline, and the record is unclear as to whether this was the *only* other such Notice of Discipline. (*Id*. at 126.)

**J.**     **First Notice of Discipline Dated December 14, 2004**

This Notice of Discipline, signed by Hertman, concerned a number of incidents that allegedly took place on November 23, 2004. (Defs. R. 56.1 Stmt. ¶¶ 40, 41.) First, the Notice of Discipline states that plaintiff was assigned that day to patrol Sector 1 but was observed traveling in Sector 2, in violation of departmental rules. (Randazzo Decl., Ex. L at 1.) Second, the Notice of Discipline states that plaintiff was scheduled to work that day as a school crossing guard at 7:00 a.m. but was absent from the post at that time, also in violation of departmental rules. (*Id*. at 2.) Plaintiff asserts that he was never advised of the time of the assignment and believed he was due at 7:30 a.m., which is when he actually arrived at the post (Defs. R. 56.1 Stmt. ¶¶ 41, 42; Pl. R. 56.1 Reply ¶¶ 41, 42.) According to plaintiff, when he arrived at the police station that morning, Sergeant Spano called him into his office and chastised him for not being at his post on time. (Sussman Aff'm, Ex. 1 at 77-78.) Although plaintiff contends that "[a]ssignment to post is typically done or confirmed in writing," the record reflects only that assignments were confirmed in writing at some time in the past. (Pl. R. 56.1 Reply, Counterstmt. ¶ 117; Sussman Aff'm, Ex. 15 at 65.) Defendants did not produce a writing confirming that plaintiff was scheduled to report to the school crossing post at 7:00 a.m. that day and Hertman testified that he could not think of a reason why the writing did not exist in this case. (Pl. R. 56.1 Reply, Counterstmt. ¶¶ 118-19.)

Third, the Notice of Discipline charges plaintiff with two incidents of submitting inconsistent paperwork. (Randazzo Decl., Ex. L at 3.) Plaintiff's Daily Activity Sheet for November 23, 2004 indicates that he was at the station between 6:30 and 7:15 a.m., however, he was observed at a different location at 6:55 a.m. (*Id*.) In addition, the Daily Activity Sheet contained an entry indicating that plaintiff ended his tour of duty at 8:30 a.m. but he also submitted a request for

compensation time certifying that he had worked until 8:45 a.m. (Defs. R. 56.1 Stmt. ¶ 44.)  Plaintiff has admitted that he submitted these inconsistent documents.  (*Id*. ¶ 45.)  The Notice of Discipline sought termination for these alleged violations of departmental rules.  (Pl. R. 56.1 Reply, Counterstmt. ¶ 115.)

### K.  <u>Second Notice of Discipline Dated December 14, 2004</u>

This Notice of Discipline, signed by Hertman, sets forth that on November 24, 2004, plaintiff pulled over a vehicle and ignored an order by Spano, who had arrived on the scene, to activate the camera in his patrol vehicle.  (Randazzo Decl., Ex. M..)  Plaintiff told Spano that he did not believe he had to turn on his camera because it was a dispatched call, rather than a self-initiated stop.  (*Id*.)  Plaintiff thought that Spano's communication was a suggestion rather than an order and did not believe that he was required to activate his camera on dispatched calls.  (*Id*., Ex. C at 80-81.)  Plaintiff states that Hertman had advised him of this policy and that Spano never contradicted this during their interaction on November 24, 2004.  (Pl. R. 56.1 Reply, Counterstmt. ¶ 122.)  Hertman confirmed that an officer was only required to videotape contact with civilians on self-initiated, not dispatched, stops; that the incident on November 24, 2004, was a dispatched call; and that Spano was present with his camera turned on, capturing the contact between the police and the civilian.  (*Id*. ¶¶ 123-24.)  Hertman could not recall the reason Spano gave for requiring plaintiff to turn his own camera on.  (Sussman Aff'm, Ex. 15 at 92.)  This Notice of Discipline proposes termination as a penalty.  (Pl. R. 56.1 Reply, Counterstmt. ¶ 121.)

Plaintiff was suspended for thirty days in December 2004 because of the June 2004 incident (involving Llanos) and the two reports of insubordination by Spano, the first relating to plaintiff's

alleged failure to activate his camera and the second relating to his alleged failure to report timely to the school crossing guard assignment. (*Id*. ¶ 126.) Hertman testified that he became aware of other police officers who failed to turn on their cameras on self-initiated stops, that he issued Notices of Discipline against them, and that if these officers had been disciplined for this written records would exist. (*Id*. ¶ 231.) According to plaintiff, defendants failed to produce such records during discovery. (*Id*.; Sussman Aff'm at 5, Ex. 15 at 155.) Plaintiff adds that Hertman could not recall whether he had received reports from sergeants concerning other police officers who had been insubordinate. (Pl. R. 56.1 Reply, Counterstmt. ¶ 232.)

### L. Notice of Discipline Dated April 27, 2005

The charges in this Notice of Discipline are as follows. On January 27, 2005, Deputy Chief Quinn informed plaintiff that his personal vehicle did not bear a front plate or registration sticker, as required, and ordered him to correct the condition. (Randazzo Decl., Ex. N at 1.) During an inspection on April 12, 2005, Quinn noted that the front license plate was still missing, and a second inspection on April 21, 2005 revealed the same. (*Id*.) Plaintiff was charged with failing to obey the lawful order of a higher ranking officer and violating a Chief's Memorandum concerning compliance with New York State traffic regulations. (*Id*. at 1-2.)

These charges were brought by Quinn, and although Quinn told Hertman in advance that he was going to bring them, Hertman testified that he did not recall giving his approval to the charges before Quinn served them on plaintiff. (*Id*., Ex. D at 95.)[10] Quinn did not need Hertman's approval

---

[10] Plaintiff also directs the Court's attention to Quinn's testimony that before drawing up disciplinary charges, he generally first conferred with the Chief informing him of the occurrences. (Pl. R. 56.1 Reply, Counterstmt. ¶ 130.)

to bring the charges. (*Id*. at 77.) Plaintiff admitted that he received Quinn's order to correct the lack of registration sticker and license plate, and claims that he put the license plate on the dashboard. (*Id*., Ex. C at 82-83.)[11]

Plaintiff's PBA attorney, who represented plaintiff at the time these charges were brought, suggested to Hertman that there were other members of the department whose personal vehicles also failed to conform with traffic regulations. (*Id*., Ex. D at 95-96.) When Hertman asked the PBA attorney for the names of these other officers, the attorney would not give them to him. (*Id*. at 96.) On April 12, 2005 and April 21, 2005 when Quinn checked plaintiff's vehicle, he did not look at any vehicles other than plaintiff's to determine whether they too had lapsed registrations or lacked plates. (Pl. R. 56.1 Reply, Counterstmt. ¶¶ 134-35.) However, after plaintiff alleged that there were other vehicles in the parking lot that failed to conform to New York State traffic regulations, Quinn conducted subsequent inspections to determine whether there were any vehicles that did not display two license plates or a registration sticker (he admits, however, that he did not check whether the registration stickers were timely and valid). (*Id*. ¶ 135; Sussman Aff'm, Ex. 29 at 42-43.) According to Hertman, Quinn reported back to Hertman that "there was negative results for vehicle violations." (Randazzo Decl., Ex. D at 96-97.) Hertman himself did not make such an inspection. (*Id*. at 96.)

Plaintiff contends that "[a]t the same time Quinn wrote [him] up for not having a front license plate, the department itself maintained and used a vehicle which did not display a state-issued front license plate." (Rolon Aff. ¶ 34.) At his depositions, Hertman identified the vehicle that

---

[11] Plaintiff adds that his front license plate was "lost" sometime around April 15, 2005, and that he had reported this to the Department of Motor Vehicles and received a form which relieved him of the responsibility of displaying a front license plate. (Pl. R. 56.1 Reply, Counterstmt. ¶ 136; Sussman Aff'm, Ex. 82.)

plaintiff refers to from a photograph and confirmed that it was a Department vehicle. (Sussman Aff'm, Ex. 15 at 33.)

Hertman sustained the disciplinary notice issued by Quinn and ordered a penalty of termination on both May 10, 2005 and October 19, 2005. (Pl. R. 56.1 Reply, Counterstmt. ¶ 138.)

## M.  Notice of Discipline Dated May 3, 2005

This Notice of Discipline, signed by Quinn, charged that on December 20, 2004, January 11, 2005 and January 12, 2005 plaintiff worked as a pizza delivery person without obtaining the requisite approval for the outside employment. (Defs. R. 56.1 Stmt. ¶ 48.) At the time of the alleged violation, plaintiff was serving an unpaid suspension. (Pl. R. 56.1 Reply, Counterstmt. ¶ 139.)

Plaintiff was initially observed working at a pizza parlor by Quinn, who had just started in his position as Deputy Chief of Police. (*Id.* ¶ 142.) Quinn later shared his conversation with Hertman, who informed Quinn that plaintiff did not have prior, written approval from him to work as a pizza delivery person while on suspense status. (*Id.*) Hertman knew of no request by plaintiff for permission to work as a delivery person at the pizza parlor, but Quinn testified that Hertman told him that if plaintiff had made such a request, Hertman would have allowed it. (*Id.* ¶ 148; Sussman Aff'm, Ex. 29 at 27.) Hertman subsequently directed Quinn to conduct an investigation to determine what plaintiff was doing at the pizza parlor (Pl. R. 56.1 Reply, Counterstmt. ¶ 143; Sussman Aff'm, Ex. 74.) Quinn spent "almost the better part of two weeks" during which he spent "no more than two hours each day" observing plaintiff from a parking lot near the pizza parlor, dressed in plain clothes and using an unmarked car. (Sussman Aff'm, Ex. 29 at 24-25, 33.) A report by Quinn notes "Chief Herman recommended capturing PO Rolon on video" and Quinn did videotape plaintiff

working as a pizza delivery person. (Pl. R. 56.1 Reply, Counterstmt. ¶¶ 143-44; Sussman Aff'm, Ex. 74.) During the time that Quinn worked as Deputy Chief of the Department, Hertman did not task him with doing any similar such investigation of any other police officer. (Sussman Aff'm, Ex. 29 at 31.)

Plaintiff admits the allegations in this Notice of Discipline, which proposes termination as a penalty. (Pl. R. 56.1 Reply ¶ 49; Sussman Aff'm, Ex. 9 at 4.) Although Quinn signed the Notice of Discipline and "gave a report" to Hertman, he testified that he did not suggest or recommend that the charges be brought against plaintiff, nor did he discuss with Hertman whether the charges should be brought against plaintiff. (Pl. R. 56.1 Reply, Counterstmt. ¶¶ 140-141; Sussman Aff'm Ex. 29 at 29-31.)

With regard to all the disciplinary charges outlined above, plaintiff notes, citing Ward's deposition, that "[a]s Town Supervisor, Ward claimed to have no knowledge of the specifics of any of the disciplinary issues involved in this case or to have the capacity to evaluate the veracity of plaintiff's complaint of selective prosecution." (Pl. R. 56.1 Reply, Counterstmt. ¶ 153.) In addition, the Town Board has not had specific briefings on the charges that were brought against plaintiff. (*Id*. ¶ 154.)

Plaintiff also notes that during his tenure as Police Chief, Hertman has sought to terminate two police officers other than plaintiff. (*Id*. ¶ 229.) One case involved an officer who allegedly refused a direct order to exit his apartment after a domestic altercation with another member of the Department. (*Id*.) The second involved an officer who allegedly misused his official position to try to get a third party to return monies allegedly owed to a business. (*Id*.)

## IV.   Suspensions

Plaintiff alleges that defendants "suspended him twice in an illegal manner." (Complt. ¶ 23.) The first suspension, which was for thirty days, was a condition of the Stipulation of Settlement of March 31, 2004, in which plaintiff and the Town agreed to resolve the first four of his Notices of Discipline, dated September 24, 2002, April 10, 2003,[12] May 16, 2003 and February 20, 2004.[13] (Defs. R. 56.1 Stmt. ¶¶ 12-13.)  The second suspension, which was also for thirty days, occurred on December 14, 2004 and was the result of three separate incidents (Randazzo Decl., Ex. D at 35), the first being the events which resulted in the Notice of Discipline dated December 3, 2004 (the incident involving Llanos), the second two being plaintiff's alleged insubordination toward a supervisor (Spano) on two separate occasions (failing to activate his car camera and failing to report on time to his post of school crossing guard), resulting in the two Notices of Discipline dated December 14, 2004.  (*Id.* at 35-36, 44-45.)  As noted above, the arbitration opinion dated March 21, 2008, which reviewed the incident involving Llanos**,** held that the Town had "just cause" to suspend (but not discharge) plaintiff and imposed a suspension of forty-five days without pay.  (*Id.*, Ex. H at 31.)

## V.   Transfers, Assignments and Training

Plaintiff alleges that defendants "denied him transfer, assignments and training." (Complt. ¶ 23.)

---

[12] This Notice of Discipline was not submitted as part of the record.

[13] This Notice of Discipline was not submitted as part of the record.

A.    <u>Transfers</u>

As discussed above, plaintiff claims that when he returned to work in February 2002, Hertman assigned him to a squad led by Henneman, but after union intervention he was transferred out of that squad. After this, plaintiff made several additional requests to transfer from the new squad to which he was assigned, which was led by Spano and Scheuering, claiming that they were hostile to him or citing "arbitration/litigation proceedings" against Scheuering. (Sussman Aff'm, Ex. 58.)

Plaintiff made one such request in 2003, when disciplinary charges were pending against him in connection with the incident in which he disobeyed Scheuering's order to move his vehicle from Scheuering's parking spot and then snapped a parking sign. (*Id*., Ex. 1 at 95-96.) Plaintiff had filed a personnel complaint against Scheuering relating to this incident and therefore sought to transfer away from his squad. (*Id*. at 96.) According to plaintiff, Hertman orally responded that he would "take care of it," but he did not make the transfer. (Pl. R. 56.1 Reply, Counterstmt. ¶ 199.) Plaintiff testified that he did not know why his request for transfer was denied, however, in a memo dated August 27, 2003 from Hertman to plaintiff, Hertman explains that the request was denied because in 2002 plaintiff "requested that Sergeants Henneman and Moskowitz not be assigned any personnel complaint investigations naming [plaintiff] as a subject in light of pending litigation," and that "to avoid the appearance of any impropriety[, Hertman] granted [plaintiff's] request."(Randazzo Decl., Ex. I.) Defendants note that there were only four supervisors, including Spano, Scheuering, Henneman and Moskowitz, who supervised squads during this time period.[14] (Defs. Mem. Supp.

---

[14] Defendants do not provide a citation to the record to support their contention that Henneman and Moskowitz were the only two sergeants other than Spano and Scheuering who supervised squads.

Summ. J. at 11 n.7.)  However plaintiff's testimony indicates that there may have been at least two others: DiMilia and Walsh.  (Sussman Aff'm, Ex. 1 at 92.)

Plaintiff made another request to transfer squads in 2004, which was also denied.  (*Id*. at 97-98.)  Hertman's memo to plaintiff denying the request, dated March 12, 2004, states that if plaintiff feels that any of Scheuering's actions constitute misconduct, he may file a personnel complaint against Scheuering.  (Randazzo Decl., Ex. U.)  Finally, in 2005, after hearing that Spano had interfered with plaintiff's effort to gain employment in the Hyde Park Police Department, plaintiff twice met with Ward and requested to be transferred from Spano's squad.  Ward testified that he spoke with Hertman about this, but did not know the final outcome of plaintiff's request.  (Sussman Aff'm, Ex. 28 at 67-68.)

### B. Assignments

In 2002 plaintiff applied for the position of quartermaster at the Department, a position that did not involve extra pay or benefits.  (*Id*., Ex. 1 at 102-03.)  His application was denied, although no one else had applied for the position. (*Id*.)  It was open when plaintiff applied for it and remained open at the date of his deposition, in August 2005. (*Id*. at 104.) Subsequently, in April 2005, plaintiff volunteered to serve as the Department's warrant officer, but Quinn informed him that he had hired a different officer for the position.  (*Id*., Exs. 76, 78.)  Plaintiff testified that this officer was the only other person who applied for the position and that when the officer received the position he had worked for the Department for about a year.  (*Id*., Ex. 1 at 141.)

In March 2004, Hertman denied plaintiff's request to work as a Field Training Officer because of the "inordinate amount of personnel complaints and disciplinary charges" that had been

filed against him. (Randazzo Decl., Ex. U.) At Hertman's deposition, when questioned about these personnel complaints made against plaintiff, Hertman testified that (1) there was an allegation that plaintiff had made homosexual comments to another police officer over the Department's email system, and (2) there was an allegation that plaintiff was having sex in a Department vehicle with civilians while on duty. This second allegation Hertman had determined to be unsubstantiated in January 2003, before plaintiff requested to work as a Field Training Officer in March 2004. (Sussman Aff'm, Exs. 47-49, Ex. 15 at 110-11.) Plaintiff adds that on May 15, 2003, he received the Orange County Police Chief's Association award for "Exceptional Police Duty." (*Id.*, Ex. 50.)

### C. <u>Training</u>

Between 2003 and 2005, plaintiff made six to eight requests to Sergeant Scheuering, the Department's training officer, to attend certain training courses.[15] (Defs. R. 56.1 Stmt. ¶ 58; Randazzo Decl., Ex. C at 105.) Plaintiff initially testified that none of these requests were granted, and that the Department informed him that his request for training at a high intensity drug trafficking school was denied because the Department was currently sending others to the school. (Sussman Aff'm, Ex. 1 at 105-08.) Plaintiff also testified that he was unaware of whether other officers were approved for the same courses that he had been denied. (Randazzo Decl., Ex. C at 107.) Later plaintiff admitted that Scheuering did grant approval for plaintiff to attend a prescription drug abuse training course, but denied plaintiff's request to attend an "instructor evaluator" workshop on the

---

[15] The Consent Decree requires that each member of the Department receive certain training. (Rolon Aff. at 40.) The Department has a budget which contemplates additional training for officers, but there are no guidelines with regard to the allocation of this budget. (Pl. R. 56.1 Reply, Counterstmt. ¶¶ 182, 184.) There were twenty-four officers in the Department, excluding supervisors. (Sussman Aff'm, Ex. 15 at 132.)

ground that there were already two trained evaluators within the Department. (Defs. R. 56.1 Stmt. ¶ 59; Randazzo Decl., Ex. C at 109-10.) According to plaintiff, there were no trained evaluators in the Department at that time. (Randazzo Decl., Ex. C at 110.) Plaintiff was also approved to attend a "DRE Recertification" course and an "SFST Instructor" course in June 2003, which was cancelled because plaintiff was serving a suspension at that time. (Defs. R. 56.1 Stmt. ¶¶ 60, 61.) Finally, in January 2005, plaintiff made a request to attend a designer drug investigation seminar. (Sussman Aff'm, Ex. 1 at 142-43.) After the seminar had already started, he was asked to provide a written explanation to supplement the request and discuss the benefit that his attendance would bring to the Department. (*Id.*) According to plaintiff, no other officers had been asked to provide such an explanation in the past, and although plaintiff prepared the requested memorandum, he received no response. (Pl. R. 56.1 Reply, Counterstmt. ¶ 195.)

Defendants contend that Scheuering was responsible for all training assignments and plaintiff testified that he was "under the impression" that Scheuering made decisions regarding training requests, however, plaintiff also claims that when he questioned Scheuering about the denials of his training requests, Scheuering told him that approval for all training comes from Hertman. (Randazzo Decl., Ex. C at 106; Defs. R. 56.1 Stmt. ¶ 58; Pl. R. 56.1 Reply ¶ 58.) According to Hertman, he could not recall ever signing off on an officer's training, Scheuering did not need such approval from him and Scheuering was most often the decision maker. (Randazzo Decl., Ex. D at 136.) However, Hertman did discuss with Scheuering plaintiff's requests for training, and after plaintiff complained about not getting enough training, Hertman directed Scheuering to send plaintiff to the training that he had requested. (Pl. R. 56.1 Reply, Counterstmt. ¶ 186; Randazzo Decl., Ex. D at 136-37.)

## VI.  Teaching in the Police Academies

Plaintiff alleges that defendants "disallowed him from teaching in the police academies in Orange and Rockland Counties." (Complt. ¶ 23.)  Plaintiff twice asked Hertman's permission to teach in these two police academies, once in 2003 and once in 2004.  (Randazzo Decl., Ex. C at 27; Sussman Aff'm, Ex. 1 at 89.)  Hertman advised plaintiff that he was not granting permission because plaintiff had too many personnel complaints.  In 2003, without having first obtained permission, plaintiff worked at the Orange County academy anyway.  (Randazzo Decl., Ex. C at 28-29.)  After a subsequent request to teach in the academies, Hertman told plaintiff that if he remained free of personnel complaints for six months, he would approve the teaching request.  (Sussman Aff'm, Ex. 1 at 114-15.)  Hertman later gave plaintiff permission to teach out of uniform, in September 2004. (*Id.*, Exs. 73, 73A.)  Ward testified that Hertman told him that plaintiff could "do the job" but that he denied plaintiff permission to teach in the police academy as a representative of the Town because of "some past . . . disciplinary actions." (*Id.*, Ex. 28 at 39.)


## VII.  Access to Supervisor Ward

Plaintiff alleges that defendants "denied him access, through his chain of command, to defendant Ward."  (Complt. ¶ 23.)  According to Hertman and plaintiff, Department Rules and Regulations prohibit police officers from meeting with the Supervisor without first receiving approval from the chief, and Hertman expressly prohibited police officers from contacting the governing board, which included the Town Board and the Supervisor.  (Sussman Aff'm, Ex. 1 at 112-13; Rolon Aff. at 13.)  However, Ward testified that he has an "open door policy" and that he was unaware that Hertman had informed police officers that they could not meet with him without

Hertman's approval. (Sussman Aff'm, Ex. 28 at 52-53.)

Plaintiff asked to speak to Ward sometime in 2004 after Hertman had denied his request to teach at the police academies. (*Id.*, Ex. 1 at 113.) Hertman responded that it would not be necessary, as he would permit plaintiff to teach if six months passed without a personnel complaint against him. (*Id.* at 114.) Plaintiff also made the request to teach in writing. (*Id.*) He does not recall whether Hertman responded to his request, but in the end he never met with Ward about the issue. (*Id.*)

In addition, on December 2, 2003, plaintiff requested, in writing, of Hertman a meeting with Ward to appeal findings made on a number of personnel complaints. (*Id.*, Ex. 12.) According to a second letter to Hertman, dated February 23, 2004, plaintiff did not receive a response to the letter of December 2, 2003, and plaintiff again requested to meet with Ward.[16] (*Id.*, Ex. 13.) Plaintiff did not receive a follow-up response from Ward and never met with him to discuss the complaints. (Defs. R. 56.1 Stmt. ¶ 62; Randazzo Decl., Ex. Y.; Sussman Aff'm, Ex. 1 at 116.) However, in both 2003 and 2005 plaintiff did meet with Ward without Hertman's approval. (Defs. R. 56.1 Stmt. ¶ 63.)

## VIII.   Delayed Coverage for General Municipal Law § 207(c) Benefits

Plaintiff alleges that defendants "delayed coverage under section 207(c) of the General Municipal Law for an on-duty accident." (Complt. ¶ 23.) General Municipal Law § 207(c) provides that when a police officer suffers an on-the-job injury, the officer continues to receive a salary and benefits as if serving on duty. (Sussman Aff'm, Ex. 28 at 54.) In Wallkill, before an officer can receive benefits under § 207(c), the Town Supervisor (here, Ward) must approve the application.

---

[16] He also requested that Hertman remove from his personnel file complaints marked "unsubstantiated" and "partially substantiated," citing the Best Practices Guidelines. (Sussman Aff'm, Ex. 13.)

(*Id*. at 55.)  However, if the Police Chief decides an officer is not eligible for such benefits, the Town Supervisor does not review that decision.  (*Id*.)

In June 2003, plaintiff injured his thumb in an on-the-job accident, as a result of which he was absent for two to three months of work. (Sussman Aff'm, Ex. 1 at 119.) A letter from plaintiff's union attorney to Hertman relates that plaintiff told him that plaintiff had submitted the required doctor paperwork to his supervising sergeant on the date of the injury, and plaintiff later testified that he gave the documents to his sergeant the night the accident happened  (*Id*., Exs. 54, Ex. 1 at 123.)  Upon submission of the documents, plaintiff's sergeant advised him that he would receive 207(c) benefits.  (Rolon Aff. ¶ 42.)

Pursuant to General Municipal Law § 207(c), plaintiff did receive his full salary for the time he was out of work and his hospital and doctors' bills were paid by the Town.  (Sussman Aff'm, Ex. 1 at 120.) However, plaintiff contends that Hertman delayed his submission of the paperwork required to receive these benefits. (*Id*. at 120-21.)  In a letter dated July 30, 2003, Hertman advised plaintiff that plaintiff's § 207(c) application had not been approved because Hertman had not received a hospital or doctor's report indicating that plaintiff could not return to work as of June 20, 2003, and that as a result, his missing days would be taken from accrued sick time. (*Id*., Exs. 57, 1 at 122-123.)  Plaintiff contends that he had submitted the allegedly missing doctors' reports on the day of the injury and that he resubmitted them after receipt of Hertman's notice.  (*Id*., Ex. 1 at 123; Randazzo Decl., Ex. AA.)  It is unclear from the record whether plaintiff's application was eventually approved.

## IX.    Responsiveness to Inquiries and Complaints

Plaintiff alleges that defendants "failed to respond or [] unreasonably delayed response to [his] inquiries and complaints." (Complt. ¶ 23.)  With regard to Ward, plaintiff has indicated that with this allegation, he was referring to Ward's failure to follow up on plaintiff's inquiries and complaints in January 2003 regarding the conduct of Moskowitz and Henneman during his arbitration proceeding in 2001-2002.  (Sussman Aff'm, Ex. 1 at 118, 124; Randazzo Decl., Ex. Z.)

With regard to Hertman, plaintiff could not recall the number of times Hertman failed to respond to his inquiries and complaints because, according to plaintiff, there were "[t]oo many to remember." (Sussman Aff'm, Ex. 1 at 124-25.) Plaintiff did specifically recall that he appealed two personal evaluations to which Hertman never responded, and that he made various complaints about Moskowitz and Henneman, to which Hertman gave either a delayed response or no response. (*Id*. at 125-27.)

In a letter dated November 19, 2002, plaintiff asked Hertman to investigate the conduct of Moskowitz and Henneman during the arbitration proceedings, noting that a prior request for such an investigation had been made at the time of the arbitration proceedings to then Chief John Beairsto and Supervisor Tom Nosworthy, but that no investigation had taken place.  (*Id*., Ex. 22.)  Hertman responded, in a letter dated November 21, 2002, that no investigation would be conducted due to the allegations of misconduct that had been previously reported to Town officials, as this would violate the collective bargaining agreement's 180-day limitation.  (*Id*., Ex. 23.)  On December 3, 2002, plaintiff met with Hertman "to explain why the integrity of the department depended on acting against supervisors who . . . give perjurious testimony and fail to cooperate in arbitral proceedings." (Rolon Aff. ¶ 27.)  Hertman responded that the Department would not initiate personnel complaints

against Henneman and Moskowitz, again offering as explanation that to do so would violate the collective bargaining agreement. (Sussman Aff'm, Ex. 24.)

In a second letter dated November 19, 2002, plaintiff related to Hertman that he had reason to believe that Moskowitz had made disparaging comments to a civilian who had allegedly committed domestic violence and that Moskowitz had wrongfully allowed the civilian to remain at his residence, resulting in further police involvement that evening at that residence involving plaintiff. (Pl. R. 56.1 Reply, Counterstmt. ¶ 70; Sussman Aff'm, Ex. 25.) According to plaintiff, Hertman refused to investigate the incident. (Rolon Aff. ¶ 28.)

On January 2, 2003, plaintiff filed a personnel complaint with Hertman, reporting that Moskowitz had refused to let him leave work early due to illness unless plaintiff first called the Chief of Police at home. (Sussman Aff'm, Ex. 35.) Plaintiff had never heard of such a policy and did not believe that Moskowitz had required the same of another officer who had left work early for illness that day. (*Id*.) In the personnel complaint, he told Hertman that he felt he was being "harassed, beleaguered, targeted, and . . . [that] Moskowitz has a personal vendetta against [him]." (*Id*.) On the same day, plaintiff also sent a letter to Hertman alleging specific examples of violation of Department policy by Henneman and Moskowitz. (*Id*., Ex. 36.)

On January 4, 2003, plaintiff requested of Hertman more information about pending personnel complaints against him. (*Id*., Ex. 37.) According to plaintiff, police officers who were the subject of civilian complaints were to be advised of those complaints as a matter of Department policy and practice, yet Hertman repeatedly refused to apprise plaintiff of any such complaints against him. (Rolon Aff. ¶ 37.) Plaintiff was concerned about the content of the complaints, but was not permitted to confront them; instead, if plaintiff was notified about a complaint, he only received

30

cursory letters showing a complaint number and indicating whether the complaint was substantiated. (*Id*.)  When plaintiff's union counsel sought to determine who had filed unsubstantiated complaints against plaintiff, the Town refused to provide this information, citing Section 87 of the Public Officer's Law.  (Sussman Aff'm, Exs. 41, 42, 44, 45.)

According to Hertman, a police officer does not have a right to confront or dispute a complaint brought against him.  (Pl. R. 56.1 Reply, Counterstmt. ¶ 168.)  However, according to Ward, under the Consent Decree, someone from the Department must notify police officers about complaints filed against them.  (Sussman Aff'm, Ex. 28 at 26-27.)  Ward was unaware that Hertman did not think police officers have a right to this information.  (*Id*. at 27-28.)  At one point, Quinn lowered plaintiff's evaluation report rating because of the personnel complaints that had been served against plaintiff. (*Id*., Ex. 29 at 63.) According to Quinn, plaintiff should have known about these complaints.  (*Id*. at 65.)

Plaintiff asserts that, to his personal knowledge, "in other instances where a complaint was lodged against a police officer, defendant Hertman or his representative met with that member and sought his side of the story." (Rolon Aff. ¶ 38.) For example, in 2005, plaintiff obtained employment with the Hyde Park Police Department, however, the day that he was supposed to commence employment there, the Hyde Park Police Department received an anonymous email warning that, *inter alia*, plaintiff was "not what you should look for in a police officer." (Sussman Aff'm, Exs. 83, 1 at 10-12.)  As a result, his employment was delayed until the allegations in the email could be investigated.  (*Id*., Ex. 1 at 12.)  The police chief of Hyde Park commenced an investigation of the email.  (*Id*. at 13.)  According to plaintiff, the police chief and members of the Hyde Park Police Department told him that Spano had made disparaging comments about plaintiff to them. (Rolon

Aff. ¶ 39.)  Plaintiff reported the email to Hertman, who told him that he would look into it. (Sussman Aff'm, Ex. 1 at 14.) Plaintiff also filed a personnel complaint against Spano, alleging that Spano had interfered with his application for employment when he had contact with members of the Hyde Park Police Department at a training session. (*Id*., Ex. 15 at 100-01.)  At the time of Hertman's deposition in November 2005, the Department was still investigating the allegations. (*Id*. at 101-02.) Plaintiff points out that Hertman personally interviewed Spano about the allegation, but that Quinn, who handled the investigation for the Town of Wallkill, never spoke with plaintiff about the matter (Rolon Aff. ¶ 39; Sussman Aff'm, Ex. 15 at 101-02.)[17]

## X.     Denial of Access Under FOIA

Plaintiff alleges that defendants "denied him access to records available under FOIA." (Complt. ¶ 23.)  Hertman testified that a police officer may use the FOIA to request documents from the officer's own department, and that after such requests are made, the Town Clerk forwards the request to the Chief of Police.  (Pl. R. 56.1 Reply, Counterstmt. ¶¶ 241-42.)  In 2003 or 2004, plaintiff made a request to the Town Clerk of Wallkill for certain of the Department's salaries (including Hertman's), bills, vouchers and related information.  (Randazzo Decl., Ex. C at 128-29; Sussman Aff'm, Ex. 84.) According to plaintiff, the clerk responded that Hertman had given her a direct order not to release any information to plaintiff. (Randazzo Decl., Ex. C at 129.) Subsequently, plaintiff's similar request for records about Quinn was granted and the records provided.  (*Id*. at 131.)

---

[17] Plaintiff also provided a second example of when a police officer (Moskowitz) was the target of a personnel complaint was notified of charges brought against him and interviewed as part of the investigation.  (*See, e.g.*, Pl. R. 56.1 Reply, Counterstmt. ¶ 222.)

## XI.     Working More Than 16 Consecutive Hours

Plaintiff alleges that defendants "required him to work more than sixteen consecutive hours on several occasions against departmental practice." (Complt. ¶ 23.) According to plaintiff, on two occasions in November 2004, while working as a school crossing guard at the direction of Spano, he was required to work thirty to forty-five minutes longer than the sixteen hour limit imposed by departmental policy. (Randazzo Decl., Ex. C at 132-33.) When plaintiff complained to Hertman, Hertman said that he did not see any improprieties in what Spano had done (*Id.* at 133.) Defendants point out that Hertman was not involved in the decision to have plaintiff work longer than sixteen hours, and other officers were required to work more than sixteen hours on occasion (Defs. Mem. Supp. Mot. for Summ. J. at 1.) According to plaintiff, officers are required to work more than sixteen hours only when there are "special circumstances" and situations "only fall into the [special circumstances] category if you have an arrest or you're working a case. Other than that, it's frowned upon." (Randazzo Decl., Ex. C at 134.)

## DISCUSSION

## I.     Standard of Review

Summary judgment is appropriate when there is no genuine issue of material fact and one party is entitled to judgment as a matter of law. *See* FED. R. CIV. P 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986). The burden is on the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the moving party has carried its burden, the opponent must do more than simply show that there is "some metaphysical doubt as to the material facts," it must come forward with "specific facts

33

showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation marks and citation omitted; emphasis in original). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). In deciding whether to grant summary judgment, the Court resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

## II.      Plaintiff's First Amendment Retaliation Claim

To prevail on a First Amendment retaliation claim, a plaintiff must establish: "that the speech at issue was protected, that he suffered an adverse employment action, and that there was a causal connection between the protected speech and the adverse employment action." *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir. 1994). "If a plaintiff establishes these three factors, the defendant has the opportunity to show by a preponderance of the evidence that it would have taken the same adverse employment action 'even in the absence of the protected conduct.'" *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999) (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

### A.      Protected Speech

The first element of plaintiff's retaliation claim is satisfied. The Second Circuit has held that "if the basis for a First Amendment retaliation claim is a lawsuit, the subject of the lawsuit must

touch upon a public concern." *Konits v. Valley Stream Cent. High Sch. Dist.*, 394 F.3d 121, 124 (2d Cir. 2005). "Speech addresses a matter of public concern when it relates to 'any matter of political, social, or other concern to the community.'" *Moskowitz v. Coscette*, 3 Fed. App'x 1, 4 (2d Cir. 2001) (citing *Lewis v. Cowen*, 165 F.3d 154, (161 2d Cir. 1999)). The Circuit "view[s] concerns raised to the government about the lawfulness of public officials' actions as implicating a matter of public interest." *Hoyt v. Andreucci*, 433 F.3d 320, 330 (2d Cir. 2006). In this case, plaintiff's 2000 lawsuit and subsequent arbitration proceedings in 2001-02 charged that the Department, the Town and the Police Commission, as well as individual members thereof, had wrongfully suspended him in violation of the collective bargaining agreement. This allegation of governmental and official misconduct "touch[es] upon a public concern." Indeed, "[d]efendants do not dispute that plaintiff has established the first element, that his 'speech' in the form of the 2001 lawsuit and 2001 arbitration, was protected." (Defs. Mem. Supp. Summ. J. at 17 n.8.) Thus, the protected speech element of the retaliation claim is satisfied.

### B.     Adverse Employment Action

The Court now examines whether the adverse employment action requirement is also satisfied. "Adverse employment action," which has been defined broadly by this Circuit, *Hoyt*, 433 F.3d at 328, may include "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) (internal quotation marks and citation omitted). The Second Circuit recently clarified that "the proper legal test in determining whether an employment action is adverse in First Amendment retaliation cases is whether the alleged acts 'would deter a similarly situated individual of ordinary firmness from exercising his or her

constitutional rights.'" *Dillon v. Morano*, 497 F.3d 247, 254 (2d Cir. 2007) (quoting *Zelnick v. Fashion Inst. of Tech.* 464 F.3d 217, 225 (2d Cir. 2006)).[18]  Thus, "whether an undesirable employment action qualifies as being 'adverse' is a heavily fact-specific, contextual determination." *Hoyt*, 433 F.3d at 328.

In this case, plaintiff has set forth a number of specific examples of conduct by defendants which, plaintiff claims, satisfy the "adverse employment act" requirement.  Defendants argue that, apart from the two allegedly illegal suspensions, none of the allegations of misconduct rise to the level of an adverse employment action.  (Defs. Mem. Supp. Summ. J. at 17.)  Addressing the suspensions, defendants contend that the first 30-day suspension was not an adverse employment act because it was imposed as a part of a stipulation of settlement of disciplinary charges, and that plaintiff should be estopped from claiming that the second suspension constituted an adverse employment action because it was found to be lawful in the 2008 arbitration decision.  (*Id*. at 17-18.)

The Court first addresses this threshold matter of whether the suspensions can be considered in support of plaintiff's claim.  First, the Court holds that the Stipulation of Settlement of March 31, 2004 does not bar plaintiff from basing a retaliation claim in part on the fact that defendants brought the underlying charges.  Pursuant to the terms of the Stipulation of Settlement, plaintiff admitted his guilt with respect to the incidents in the Notices of Discipline dated September 24, 2002, April 10, 2003, May 16, 2003 and February 20, 2004.  (Randazzo Decl., Ex. G at 2.)  In addition, plaintiff

---

[18] Defendants erroneously contend that "an adverse employment action is a 'materially adverse change in the terms and conditions of employment.'"  (Defs. Mem. Supp. Summ. J. at 16 (citing *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).)  Subsequent to that case, the Circuit has clarified that the standard enunciated in *Galabya*, which involved an age discrimination claim, is a "more demanding" standard than the one applied in First Amendment cases.  *Dillon*, 497 F.3d at 254.

waived "any rights he may have pursuant to the collective bargaining agreement to dispute the charges contained in the aforementioned Notices of Discipline." (*Id.* at 2.)  Thus, by signing the agreement, plaintiff waived only his right to dispute the truth of the charges but did not waive his right to challenge the charges as retaliatory in violation of his First Amendment rights.  Moreover, the Court notes that defendants do not cite any legal authority for the proposition that, having consented to the suspension, "plaintiff can hardly be heard to complain that the suspension is any type of adverse employment action." (Defs. Mem. Supp. Summ. J. at 18.)  *See  Russo v. City of Hartford*, 419 F. Supp. 2d 134, 149 (D. Conn. 2006) (rejecting defendants' argument that two-day suspension was not an adverse employment action merely because plaintiff waived his right to a disciplinary hearing and accepted suspension).

Second, the Court holds that the arbitrator's decision of March 21, 2008, does not preclude consideration of the second suspension or its underlying charges.  Defendants argue that plaintiff should be precluded from arguing that Hertman's suspension of plaintiff constituted an adverse employment action because the arbitrator determined that the suspension was lawful.  (Defs. Mem. Supp. Summ. J. at 18.)  Collateral estoppel is not applicable here, because a plaintiff is estopped from raising an issue only if, in the prior proceeding, "the identical issue was raised" and "the resolution of the issue was necessary to support a valid and final judgment on the merits." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (internal quotation marks and citations omitted).  In the arbitration proceedings that culminated in the arbitration opinion of 2008, plaintiff did not raise the issue of whether his suspension constituted an adverse employment action for purposes of a First Amendment retaliation claim and the resolution of this issue was not necessary to support the final judgment. Thus defendants' reliance on *Boguslavsky* is misplaced. *See also*

*Levich v. Liberty Cent. Sch. Dist.*, 361 F. Supp. 2d 151, 163 (S.D.N.Y. 2004) (J. Conner) (declining to apply issue preclusion to administrative proceeding determination that plaintiff's speech was not protected by the First Amendment). Likewise, res judicata is inapplicable here as well. In *McDonald v. City of West Branch*, a case factually similar to the case at bar, the Supreme Court held that "in a § 1983 action, a federal court should not afford res judicata or collateral-estoppel to effect an award in an arbitration proceeding brought pursuant to the terms of a collective-bargaining agreement." 466 U.S. 284, 292 (1984). Thus, the 2008 arbitrator's opinion does not preclude plaintiff from asserting that either the suspension that the arbitrator imposed or the disciplinary charges underlying the proceeding constituted an adverse employment act.[19]

The Court now turns to whether plaintiff has established that he suffered an adverse employment action. In *Phillips*, the Second Circuit stated that precedent permitted "a combination of seemingly minor incidents" to form the basis for an adverse employment action giving rise to a First Amendment retaliation claim once the incidents "reach a critical mass." 278 F.3d at 109. In that case, a member of a county sheriff's department, Ms. Phillips, brought a First Amendment retaliation claim against her employer, claiming that after she engaged in protected speech, her employer displayed disparate treatment toward her, including the following: supplying her with an ill-fitting bullet-proof vest that required her to wear her shirt over it, rather than under it, and to leave unbuttoned the center button; directing her to make an "unusual warrant arrest" and then refusing to assist her with it; chastising her for violating a new directive of which she had never been made aware; denying her overtime pay because she had not obtained prior approval, which had not been

_____

[19] However, the *McDonald* Court noted that an arbitrator's findings are admissible evidence in § 1983 actions, and the district court may accord it weight as the court sees fit. 466 U.S. at 292.

required previously; calling her "insubordinate" and "stupid" because she punched her time card two minutes late; and conducting a "counseling session" during which she was admonished for, "among other things, not using a radio to sign in and out of service even though she had told the lieutenant that the radio in the car to which [she was] assigned . . . was broken and irreparable." *Id.* at 106-08.

The Second Circuit affirmed the jury's finding that Ms. Phillips had suffered an adverse employment action, noting that, although the treatment she experienced "can be deemed incidents that normally occur in a working environment . . . the jury was entitled to conclude that Phillips adequately described a pattern of nearly constant harassment by her supervisors that took place over a period of several years." *Id.* at 108 (internal quotation marks omitted). The Court then elaborated on the standard for "adverse employment action," holding that:

> in order to prove a claim of First Amendment retaliation in a situation other than the classic examples of discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand, plaintiff must show that (1) using an objective standard; (2) the total circumstances of [plaintiff's] working environment changed to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace.

*Id.* at 109. The Court found sufficient evidence that a jury, "looking at [the facts] collectively over a period of several years," could reasonably conclude under this standard that Ms. Phillips had suffered an adverse employment action. *Id*. at 110.

In the case at bar, when events are examined collectively over a period of years, there is a genuine issue of fact as to whether, "using an objective standard . . . the total circumstances of [platintiff's] working environment changed to become unreasonably inferior." *Id*. at 109. Viewing the evidence in the light most favorable to plaintiff, as the Court must on a motion for summary judgment, a reasonable jury could find that defendants arguably engaged in conduct at least as egregious as did Ms. Phillips's employer. Just as Ms. Phillips was chastised for violating a policy

about which she was not on notice, a reasonable jury could find that plaintiff was charged with a number of disciplinary charges atypical of a normal workplace, including: reprimanding plaintiff for violating new policies about which he had not been instructed, such as the proper preparation of Stop Reports (Notice of Discipline dated Sept. 24, 2002; Letter of Instruction dated Sept. 30, 2002) and for violating policies that had not yet been established at the Department, such as the requirement that supervisors sign off on Stop Reports before they are submitted to the bin (Notice of Discipline dated Nov. 29, 2004); propounding Letters of Instruction against him without first discussing the underlying matters with him, contrary to departmental policy (Letter of Instruction dated Nov. 18, 2002; Letter of Instruction dated February 18, 2003); seeking his termination for driving into a sector of the Town to which he had not been assigned, when, as Hertman admitted, the circumstances indicated "police necessity" and therefore should not constitute a violation (Notice of Discipline dated Dec. 3, 2004, the "Llanos incident");   reprimanding plaintiff for arriving "late" to an assignment for which plaintiff claims he was on time (First Notice of Discipline dated Dec. 14, 2004)[20] and for disobeying an "order" to turn on his camera that plaintiff claims was only a suggestion, and which Hertman confirmed was not in accordance with departmental procedures regarding videotaping (Second Notice of Discipline dated Dec. 14, 2004). *See also Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004) (as a matter of law, filing of administrative charges may constitute adverse employment action); *Moskowitz*, 3 Fed. App'x at 6-7 (commencement of disciplinary proceedings, in conjunction with assignment to desk duty, negative

---

[20] Although there is a dispute of fact as to what time plaintiff was actually due at his post on this occasion, all such disputes must be resolved in favor of the non-moving party on a motion for judgment, and reserved for the trier of fact.  Thus, plaintiff's contention that he was on time for the post must be accepted as true for the purposes of this Opinion.

evaluations and denial of promotion to sergeant sufficient to constitute adverse employment action).

In addition, a reasonable jury could also find that defendants' denials of plaintiff's requests for squad transfers, assignments and training courses contributed to "the total circumstances of [plaintiff's] working environment chang[ing] to become unreasonably inferior and adverse when compared to a typical or normal, not ideal or model, workplace." *Phillips*, 278 F.3d at 109. As to the squad transfer requests, there is an issue of fact for the jury as to whether there was a squad to which plaintiff could have been reassigned led by sergeants against whom plaintiff had no outside legal matters pending.[21] A reasonable jury could determine that plaintiff was denied such an alternative and that this contributed to an aggregation of incidents constituting adverse employment action.[22] Similarly, a jury could reasonably determine that defendants' refusal to grant plaintiff the position of quartermaster, which was and remains vacant, and the position of warrant officer, which was instead filled by an officer with less experience in the Department than plaintiff, constituted adverse employment acts. Similarly, the jury could reasonably conclude that Hertman's refusal to allow plaintiff to work as a Field Training Officer was an adverse employment action, or contributed to a work atmosphere constituting adverse employment action. Although these are not paying

---

[21] Defendants assert that the only other sergeants to whose supervision plaintiff could have been assigned were Moskowitz and Henneman, however, the record reflects that it might have been possible for plaintiff to have been assigned to Sergeants DiMilia or Walsh.

[22] Defendants contend that "denial of transfer even to get away from a particular supervisor does not constitute adverse employment action," however, the case to which they direct the Court, *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123 (2d Cir. 2004) does not support this proposition. (Defs. Mem. Supp. Summ. J. at 18.) That case, which was decided under the old more stringent *Galabya* standard, involved a plaintiff who was denied a transfer to a different office of her employer's company located in Las Vegas. The plaintiff requested the transfer because of her preference to live in that city, where she owned a home; the opinion does not reflect that she requested the transfer out of a desire to get away from a particular supervisor. *Williams*, 368 F.3d at 128. Thus, defendants' citation is misplaced.

positions, and thus plaintiff was not denied the opportunity for additional compensation, the jury could reasonably determine that losing the opportunity to obtain additional job responsibilities, experience and prestige would deter an officer in plaintiff's position from asserting his First Amendment rights, and therefore contribute to a finding of adverse employment action. Similarly, a reasonable jury could conclude that denying plaintiff requested training courses and permission to teach in the police academies, both of which would give him additional experience and qualifications, contributed to an adverse employment action on the part of defendants.

The record reflects a genuine issue of fact regarding whether plaintiff was denied access to Ward, since plaintiff contends that Hertman forbade officers to meet with Ward without Hertman's approval, and defendants claim that plaintiff met with the Supervisor on more than one occasion. If the jury determines that plaintiff was denied access to Ward, it could also reasonably conclude that this contributed to an adverse employment action, in that "the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal . . . workplace." *Phillips*, 278 F.3d at 109.

The record also reflects a genuine issue of fact regarding whether plaintiff was denied benefits he to which he was entitled under General Municipal Law § 207(c). Defendants assert that plaintiff did receive his full salary for the time that he was absent from work due to his on-the-job injury, and that all his medical expenses were paid. However, the letter from Hertman to plaintiff dated July 30, 2003, suggests that his missing days might have been taken from his accrued sick leave days. It is unclear how the matter was ultimately resolved. Moreover, while plaintiff asserts he submitted all of the necessary paperwork, defendants claim that he never submitted a required doctor's report indicating that plaintiff was still medically unfit for work on June 20, 2003. If the

42

jury determines that plaintiff lost sick leave days as a result of defendants' wrongful charging of sick leave days, this could constitute an adverse employment action. *See Galabya*, 202 F.3d at 640 (adverse employment action may be "indicated by a less distinguished title, *a material loss of benefits*, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.") (internal quotation marks and citations omitted; emphasis added).

Additionally, a reasonable jury could also determine that Hertman's and Ward's lack of responsiveness to plaintiff's complaints contributed to a situation in which "the total circumstances of her working environment changed to become unreasonably inferior and adverse when compared to a typical or normal . . . workplace," *Phillips*, 278 F. 3d at 109, especially since many of plaintiff's complaints were that he was not informed when personnel complaints had been filed against him. Construing the facts in the light most favorable to plaintiff, police officers who are the subject of civilian complaints are to be advised of those complaints. Finally, denying plaintiff access to records to which he was entitled and requiring plaintiff to work shifts longer than the maximum permitted by departmental policy, although seemingly incidental, could also, in conjunction with other conduct described above, contribute to a finding of adverse employment action.

Thus, viewing the evidence in the light most favorable to plaintiff, a reasonable jury could determine that defendants' conduct "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Dillon*, 497 F.3d at 254 (internal quotation marks and citation omitted). Defendants have failed to sustain their burden of showing that there is no genuine issue of fact regarding whether plaintiff suffered an adverse employment action.

## C.    Causation

Plaintiff has also satisfied the third element to sustain his retaliation claim, "that there was a causal connection between the protected speech and the adverse employment action." *Blum*, 18 F.3d at 1010. "The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action, that is to say, the adverse employment action would not have been taken absent the employee's protected speech." *Morris*, 196 F.3d at 110. "Causation can be established either indirectly . . . for example, by showing that the protected activity was followed by adverse treatment in employment, or directly, by evidence of retaliatory animus." *Id.* Furthermore, "[s]ummary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision." *Id.*

In the case at bar, plaintiff contends that the adverse employment actions taken against him commenced in February 2002, after the conclusion of his 2000 lawsuit and 2001-02 arbitration proceeding, and that the actions continued throughout the following three years. Upon his return to the Department, plaintiff was assigned to a squad led by Henneman, who had testified falsely against him in his arbitration proceeding, as reported in the arbitrator's opinion. The record reflects that there are genuine issues of fact as to whether plaintiff actually was assigned to Henneman's squad and whether Hertman was involved in the assignment. Viewing the facts in the light most favorable to plaintiff, as this Court must on a motion for summary judgment, the Court concludes that a reasonable jury could find that Hertman was aware of Henneman's improper conduct during plaintiff's arbitration but improperly disregarded that consideration in assigning plaintiff to Henneman's squad.

44

Plaintiff alleges that he suffered ongoing adverse conduct by defendants continuing from this initial squad assignment in early 2002, including being charged with a series of disciplinary notices commencing later that same year. Indeed, the first Notice of Discipline plaintiff received, dated September 24, 2002, contained charges regarding incidents that allegedly took place in March 2002; these charges ultimately resulted in plaintiff's first suspension, in 2004. A jury could find that plaintiff started to suffer adverse employment actions in February 2002, the first possible opportunity for retaliatory conduct upon plaintiff's return to work after engaging in protected speech, and that plaintiff continued to suffer adverse actions throughout the following years. The close temporal proximity between plaintiff's protected speech and the commencement of this series of allegedly adverse actions is indirect evidence of a causal connection between the two.[23]

Plaintiff presented, as further indirect evidence that defendants engaged in adverse actions because of his 2000 lawsuit and 2001-02 arbitration proceeding, evidence that police officers situated similarly to himself were not treated as he was. *See Sumner v. U.S.P.S.*, 899 F.2d 203, 209 (2d Cir. 1990) (causal connection between protected activity and adverse action can be shown through

---

[23] Defendants argue that plaintiff has failed to establish such a causal connection because the lapse of time between the protected speech and the allegedly adverse actions, which defendants indicate to be the suspension of December 2004 or the Notices of Discipline from 2004 and 2005, "is sufficient in and of itself to negate the claim as a matter of law that the adverse action resulted from a retaliatory motive." (Defs. Mem. Supp. Summ. J. at 19.) Defendants mistakenly place the commencement of the alleged adverse actions in 2004 and 2005, whereas there is sufficient evidence in the record for a reasonable jury to conclude that the conduct actually started in early 2002, as discussed above. However, even if the commencement date is placed at a later point in time, this Court recognizes that "the absence of close temporal proximity of the protected activity to the adverse action is not necessarily fatal, because evidence of an ongoing pattern of retaliatory conduct and intent can also establish a causal connection." *Shub v. Westchester Cmty. Coll.*, 556 F. Supp. 2d 227, 246 (S.D.N.Y. 2008) (J. Conner). In this case, plaintiff has presented evidence of an "ongoing pattern of retaliatory conduct" sufficient to withstand a motion for summary judgment.

evidence of disparate treatment of employees who engaged in similar conduct).  Plaintiff presented evidence that, although numerous police officers and sergeants prepared improper Stop Reports, defendants provided no evidence that disciplinary charges such as those brought against plaintiff (Notice of Discipline dated Sept. 24, 2002; Letter of Instruction dated Sept. 30, 2002; Notice of Discipline dated Nov. 29, 2004) were also brought against other officers.  Similarly, although other officers failed to turn on their cameras during self-initiated stops, defendants failed to produce records that disciplinary charges such as those brought against plaintiff (Second Notice of Discipline dated Dec. 14, 2004) were brought against them as well, even though according to Hertman, written records would exist if those officers had been disciplined.  Moreover, there is an issue of fact as to whether officers other than plaintiff violated New York State traffic laws by failing to have the appropriate sticker and license plates on their personal vehicles, and if so, whether they were disciplined like plaintiff for the infraction (Notice of Discipline dated April 27, 2005).  Plaintiff has set forth evidence that, while Hertman sought his termination in many of the Notices of Discipline served on plaintiff, Hertman sought to terminate only two police officers other than plaintiff during his tenure as chief; both of these cases involved officers charged with arguably more serious offenses than was plaintiff (one was charged with disobeying an order after a domestic altercation with another officer, the other was charged with abusing his police authority).

Viewing the facts in the light most favorable to plaintiff, as this Court is bound to do on a motion for summary judgment, other examples of disparate treatment include requiring plaintiff, but not other officers, to justify in writing a training request; failing to notify and interview plaintiff when a personnel complaint was filed against him, while notifying other officers and letting them explain their version of the alleged incident when such complaints were lodged against them; and

requiring plaintiff to work more than 16 hours as a school crossing guard, while only requiring other officers to work beyond this maximum time limit for shifts only when they had an arrest or were working on a case. No police officers other than plaintiff brought lawsuits against the Department in the time of Hertman's tenure as Police Chief.

Finally, plaintiff presented at least one piece of direct evidence that could support a jury finding that defendants engaged in the alleged adverse conduct with a retaliatory motive. Plaintiff's performance evaluation for April through September 2002 indicates that seven months after plaintiff's return to the Department, his reviewer gave him a fairly good overall evaluation, but wrote plaintiff "sets himself back with personal complaints" and would "recommend that [plaintiff] not take things personally." (Sussman Aff'm, Ex. 34.) A reasonable jury could conclude that this review indicates that defendants viewed plaintiff as an employee who complained too much about other members of the Department, and that this impression of plaintiff may have been formed or enhanced by the litigation he brought against the Department in 2000. In conjunction with plaintiff's indirect evidence, there is enough of a dispute of fact to withstand a motion for summary judgment.

Defendants argue that plaintiff has failed to establish a causal connection between plaintiff's protected speech and the alleged adverse conduct because neither Ward nor Hertman had any motive to retaliate against plaintiff. The Court cannot rule, as a matter of law, that neither Ward nor Hertman had any motive to retaliate against plaintiff for bringing a lawsuit against the Department or appealing his suspension at an arbitration proceeding. The lawsuit resulted in a settlement for plaintiff, and the arbitrator found the Town liable for violating the collective bargaining agreement. As neither Ward nor Hertman was directly involved in either proceeding, a reasonable jury could find that they retaliated against plaintiff out of loyalty to the Department and animus toward the

"whistle blower" based on the circumstantial and direct evidence presented by plaintiff.

The Court acknowledges that defendants have set forth a number of legitimate non-retaliatory reasons for some of the alleged disparate actions, such as plaintiff's undisputed guilt with regard to many of the disciplinary charges, and the fact that some of the charges originated from complaints against plaintiff by third parties (suggesting that defendants' conduct was merely a response to claims brought by others). However, given the evidentiary support behind plaintiff's contentions that defendants' conduct started immediately in 2002 and that defendants treated him differently than other officers similarly situated, this Court cannot hold, as a matter of law, that plaintiff has failed to raise a genuine issue of fact with regard to whether plaintiff's protected speech motivated defendants' allegedly retaliatory conduct. Rather, the determination of the motivation behind defendants' allegedly adverse actions must be left for a jury.

## III.    Liability of Defendant Ward

Defendants contend that Ward is immune from liability because he was not personally involved in any of the alleged disparate conduct. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Provost v. City of Newburgh*, 262 F.3d 146, 154 (2d Cir. 2001) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)) (internal quotation marks omitted). With regard to supervisory officials, "'[p]ersonal involvement' is not limited to direct participation by the supervisor in the challenged conduct, but may also be established by evidence of an official's (1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates

who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir. 2003).

Plaintiff argues that Ward was sufficiently involved in the adverse conduct such that he is subject to liability because he "pre-approved disciplinary proceedings against [plaintiff] and ultimately sustained each of the disciplinary matters" and his "imprimatur was required . . . *before* initiation of the charges"; because he was "responsible for personally reviewing and approving the department's recommended outcome on each civilian complaint" and "refused to intervene" when plaintiff sought the identities of his accusers; and because, even though he "was required by the Consent Decree to lead a Town Board which actively oversaw the actions of the Town's police agency," when plaintiff "complained to Ward about the Town's failure to discipline Moskowitz and Henneman for the conduct set forth in the . . . arbitral opinion of 2002 . . . Ward never as much as read that decision." (Pl. Mem. Opp. Summ. J. at 20-21 (emphasis in original).)

Defendants contend that there is no evidence that Ward pre-approved or sustained disciplinary proceedings or sanctions against plaintiff, and that regarding Ward's "alleged refusal to provide plaintiff with the names of those making accusations against him or . . . failure to discipline Sergeants Moskowitz and Henneman . . . it is unclear what constitutional right is even implicated more less [sic] has been violated by such a failure." (Defs. Reply Mem. Supp. Summ. J. at 5.)

As for Ward's role in the disciplinary charges against plaintiff, the Court finds sufficient evidence of Ward's direct involvement to withstand a motion for summary judgement. Ward testified that generally he is informed, at some point in the disciplinary process, when charges are

brought against a police officer in the Department. Ward also testified that he sometimes serves as a "hearing officer," who decides the results of those charges. The collective bargaining agreement provides such a role for the Town Supervisor. Ward was at least on notice of the disciplinary charges brought against members of the Department, including plaintiff, because, as a member of the Town Board, Ward received quarterly reports that included information on complaints against police officers and any action taken on these complaints, including discipline. In addition, Ward knew that plaintiff felt he was being "singled out for unfair treatment" by one set of disciplinary charges brought against him (Notice of Discipline dated Sept. 24, 2002). It is also undisputed that Ward affirmed at least two of Hertman's proposed disciplinary charges against plaintiff. (Sussman Aff'm, Exs. 43 (improper Stop Reports), 79 (improper Stop Reports), 80 (the Llanos incident).) This is sufficient evidence of Ward's direct participation in the alleged retaliatory conduct against plaintiff to survive a motion for summary judgment.

However, plaintiff has failed to raise a triable issue of fact regarding Ward's "refusal to intervene" when plaintiff sought the identities of those who made accusations against him. Ward testified that when plaintiff notified him that he was experiencing difficulties accessing his personnel records, Ward instructed Hertman: "whatever [plaintiff] needed, he should be able to get as far as that." (*Id.*, Ex. 28 at 46.) Moreover, he testified that Hertman had never told him that Hertman does not believe officers have a right to know about complaints filed against them. (*Id*. at 28.) This evidence implies that Ward was likely unaware that plaintiff had not been advised about some of the complaints filed against plaintiff, and it indicates that Ward addressed plaintiff's complaints regarding access to his personnel records by advising Hertman to share them with plaintiff.

As for Ward's failure to discipline Moskowitz and Henneman, plaintiff has set forth

50

sufficient evidence to indicate that Ward failed to act on the information that plaintiff provided to him about their improper conduct during his 2001-02 arbitration proceeding. Plaintiff met with Ward to discuss the incident, and, according to plaintiff, Ward responded that he would investigate the matter. However, Ward also testified that he did not remember whether he read the arbitrator's opinion and he testified that he never talked to Moskowitz about the event. He also never consulted counsel regarding whether Moskowitz and Henneman should be disciplined for their conduct. Thus, there is an issue of fact regarding whether Ward failed "to take corrective action after learning of a subordinate's unlawful conduct." *Hayut*, 352 F.3d at 753.

In sum, the record reflects sufficient evidence from which a reasonable jury could conclude that Ward was directly involved in the disciplinary charges and failed to respond to plaintiff's inquiries regarding Moskowitz and Henneman, conduct which plaintiff claims constitutes adverse employment action. Whether the conduct alone was sufficient to cause "the total circumstances of [platintiff's] working environment . . . to become unreasonably inferior" is a question of degree best determined by a jury. *Phillips*, 278 F.3d at 109.


## IV.     Qualified Immunity

Qualified immunity shields public officers from liability for damages in cases where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Defendants are entitled to qualified immunity if (1) their action did not violate clearly established law or (2) if it was objectively reasonable for them to believe that their action did not violate such law. *Warren v. Keane*, 196 F.3d 330, 332 (2d Cir. 1999).

The right not to be retaliated against for the use of the court system, including truthful testimony therein, as plaintiff alleges is the basis for the retaliation in the case at bar, is well established. *Benedict v. Town of Newburgh*, 125 F. Supp. 2d 675, 678 (S.D.N.Y. 2000). Here, defendants agree that the right not to be retaliated against for the exercise of First Amendment rights is generally established, but argue that qualified immunity is proper because the defendants did not retaliate against plaintiff, specifically because their actions did not rise to the level of an adverse employment action. As explained in greater detail above, defendants' actions do rise to the level of an adverse employment action and plaintiff has proffered sufficient evidence to withstand a motion for summary judgment on the issue of retaliation.

Because retaliation against protected speech is clearly established such that a public official would be aware of this and because plaintiff has presented evidence of retaliation sufficient to withstand a motion for summary judgment, qualified immunity is not appropriate.

## V.    Liability of the Town of Wallkill

Plaintiff seeks to hold the Town liable under § 1983 for the alleged unconstitutional acts of its employees. It is well established by the Supreme Court that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees" unless "execution of a government's policy or custom . . . inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In other words, the doctrine of *respondeat superior* does not apply to municipalities; liability only arises if the Town acts pursuant to an official policy. *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983). To prevail on a § 1983 claim against a municipality, plaintiff must prove "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."

*Batista*, 702 F.2d at 397.

The "official policy or custom requirement" can be satisfied by: (1) an officially promulgated policy endorsed or ordered by the municipality, *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986); (2) a custom or practice that is so pervasive or widespread that the municipality had either actual or constructive knowledge of it, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988); (3) actions taken or decisions made by a municipal employee who, as a matter of state law, is responsible for establishing municipal policies with respect to the area in which the action is taken, *Pembaur*, 475 U.S. at 480-83; or (4) a failure of the municipality to train its employees, when such failure rises to the level of deliberate indifference to the constitutional rights of others, *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Plaintiff has made no allegation of an official policy, custom or practice by the Town that caused his First Amendment rights to be violated. Nor has plaintiff alleged that the Town failed to train its employees properly. Rather, plaintiff seems to rest his claim on the third basis for liability – actions taken by a final policymaker of the Town.

Thus, the question before the Court is whether either Supervisor Ward or Chief Hertman was a final policymaker with respect to police officer discipline and the other areas in which plaintiff alleges he suffered adverse employment actions. "Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law. The relevant legal materials [] includ[e] state and local positive law, as well as custom or usage having the force of law. The matter of whether the official is a final policymaker under state law is to be resolved by the trial judge *before* the case is submitted to the jury." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (internal quotation marks and citations omitted; alteration and emphasis in original. "Mere discretionary authority does not establish municipal policy, however, a subordinate

employee's decisions may become municipal policy if they are reviewed and adopted by a supervising authority who is a final policymaker." Skehan v. Kelly, 2005 WL 1023206, at *10 (S.D.N.Y. Apr. 15, 2005), *rev'd on other grounds*, 465 F.3d 96 (2d Cir. 2006) (citing *Pembaur*, 475 U.S. at 481-84). "Where an official has final authority over significant matters involving the exercise of discretion, the choices he makes represent government policy. . . . An official has final authority if his decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983) (internal footnote and citation omitted). In addition, "the burden of showing that an official is the final policymaker in a given area rests on the plaintiff." *Purdy v. Town of Greenburgh*, 178 F. Supp. 2d 439, 445 (S.D.N.Y. 2002) (J. Conner) (citing *Jeffes*, 208 F.3d at 57-58.). Moreover, the Supreme Court has clarified that:

> When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality. Similarly, when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* polices.

Praprotnik, 485 U.S. at 127 (emphasis in original).

To the extent that the parties briefed this issue,[24] defendants contend that plaintiff has not provided evidence that Hertman is the final policymaker with respect to personnel decisions at the Department, while plaintiff argues that "the deposition testimony establishes that . . . Chief [Hertman] was delegated as the final municipal policy-maker with regard to imposition of discipline and that the Collective Bargaining Agreement then provides the Supervisor a critical role in

---

[24] The parties have directed the Court to no municipal authority and have provided no citations to the record to support their assertions.

reviewing and approving/modifying the decisions of the Chief." (Defs. Mem. Supp. Summ. J. at 25-26; Pl. Mem. Opp. Summ. J. at 22.) Neither party supplied the Court with a charter for the Town of Wallkill.

Under New York law, the Town Supervisor is charged with a lengthy list of powers and duties respecting town governance. *See* N.Y. TOWN LAW § 29 (McKinney 2008). Moreover, pursuant to N.Y. TOWN LAW § 150(2), towns may designate the Town Supervisor to serve as police commissioner, and as such "have and exercise all the powers relative to police matters conferred upon the town board pursuant to this article." (McKinney 2008). Ward testified at his deposition that Wallkill used to have a police commission, but that it was "replaced by . . . the state law where the Town Board or the supervisor is the police commissioner. I'm not sure which it is exactly." (Sussman Aff'm, Ex. 28 at 9.) The Court infers from this testimony that the Town appointed Supervisor Ward to serve as police commissioner.[25] Thus, at the relevant time periods, as police commissioner Ward held "all the powers relative to police matters conferred upon the town board" under state law. N.Y. TOWN LAW § 150(2). Finally, the collective bargaining agreement bestows upon the Town Supervisor the responsibility to review the Police Chief's decisions regarding disciplinary charges and the power to impose a penalty, if appropriate. Ward's testimony confirms that he had broad authority over police matters as he was responsible for signing off on civilian complaints and internal discipline and for approving the § 207(c) status of officers. (Sussman Aff'm,

---

[25] N.Y. TOWN LAW § 150(2) provides that if the town board appoints only one commissioner, as opposed to establishing a board of police commissioners, "it shall in addition designate two members of the town board to serve as members of such police commission." Ward testified that he appointed two members of the Town Board as liaisons to the Department. This supports the Court's inference that the Town must have designated Supervisor Ward as police commissioner, who, therefore, had authority to delegate two liaisons.

Ex. 28 at 24, 63, 55.) He was also responsible for creating and submitting the Department's budget and was involved in discussions "at the Town Board level" regarding plaintiff's claims for back pay after the arbitration decision of 2002. (*Id.* at 58-59, 68-69.) Therefore, the Court holds, as a matter of law, that Ward was a "final policymaker" with regard to the Department's policies. *See Glenview Constr., Inc. v. Bucci*, 165 F. Supp. 545, 553 (S.D.N.Y. 2001) (J. Conner) (Town Supervisor was a "final policymaker" because of "plethora of municipal responsibilities conferred" by N.Y. TOWN LAW § 29 (1)-(16) and testimony that Supervisor had authority "to act on his own."). Plaintiff has established enough evidence of municipal liability based on Ward's actions to deny the Town's motion for summary judgment.

With regard to Chief Hertman, there is likewise enough evidence of his policymaking authority to withstand a motion for summary judgment. The record reflects that Hertman had authority to create policy and make final decisions in some areas through his oversight of the Department, including areas in which plaintiff alleges to have suffered adverse employment actions. The record suggests that Hertman had final authority to make job assignments[26] and that there is an issue of fact as to whether Hertman was responsible for squad assignments[27] and approval of training requests. Ward, testifying regarding the procedure through which officers obtain approval for employment outside the Department, stated that "the policy is they get permission from the chief,"

---

[26] Hertman denied plaintiff's request for Field Training Officer; there is no indication that Ward or the Town Board reviewed Hertman's decision.

[27] Plaintiff contends that Hertman assigned him to Henneman's squad upon his return to work in 2002, but Hertman testified that he did not make the assignment. Later, after plaintiff met with Ward requesting to be transferred from Spano's squad, Ward spoke to Hertman about the transfer, but did not know the final outcome of plaintiff's request. Thus, it seems that the Chief of Police, rather than the Supervisor, is the final decision maker regarding squad transfer requests.

although Ward did not know whether there are any standards the chief must use to make his determination. (Sussman Aff'm, Ex. 28 at 37-38.) In addition, Hertman established Department policy prohibiting officers from contacting members of the Town Board without Hertman's prior consent, and determined officers' eligibility for § 207(c) benefits; while a decision that an officer was eligible was reviewed by Ward, a decision that an officer was not eligible was not reviewed, thus becoming the Town's final policy. Hertman believed that officers do not have the right to confront or dispute civilian complaints brought against them and ran the Department accordingly; Ward disagreed with this policy, but was unaware of Hertman's position on the matter before his deposition for this litigation, suggesting that Hertman's procedures regarding the treatment of complaints were likewise not subject to review. Thus, there is enough evidence that Hertman was the final decision maker in these areas to withstand a motion for summary judgment. However, because plaintiff has failed to direct the Court to any state or local law that confers policymaking authority on the Wallkill Police Chief, the Court declines to rule as a matter of law that Hertman was a final policymaker. *See Rubio v. County of Suffolk*, No. 01-CV-1806 (TCP), 2007 WL 2993833, at *7 (E.D.N.Y. Oct. 9, 2007) (plaintiffs failed to establish municipal liability in part because they "did not point . . . to any provision of State or local law that subscribes policymaking authority to . . . Suffolk County Police Chief."); *Albert v. City of Hartford*, 529 F. Supp. 2d 311, 330 (D. Conn. 2007) (police chief not a final policymaker because city charter and local ordinances reflected constraints on his exercise of discretion). Therefore, defendants' motion for summary judgment on the claims against the Town is denied.

## CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment is denied.

SO ORDERED.

Dated: White Plains, New York
      October 24, 2008

                                                  Sr. United States District Judge